UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 07/17/2018

-------------------------------------------------------------X

RAMÓN ÍSÍDRO MEJÍA,       :
                          :
                Plaintiff, :
        -against-          :                 16-cv-9706
                          :
                          :          MEMORANDUM OPINION
NEW YORK CITY HEALTH AND   :              AND ORDER
HOSPITALS CORPORATION; MARK A. :
SCHEAR, MD                 :
                          :
                Defendants. :
-------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

On September 10, 2015, Plaintiff was peacefully in his apartment when police officers
arrived at his door, shot out his peep hole, and forced him outside to be transported to the North
Central Bronx Hospital. Upon arriving at the hospital, Plaintiff was involuntarily admitted without
being asked about his medical history and without being evaluated by any doctor. Plaintiff was held
down and medicated with antipsychotic drugs against his will. Despite his pleas to leave, Plaintiff
was confined in the hospital for six days. Plaintiff filed this matter *pro se*, bringing claims against
New York City Health and Hospitals Corporation ("HHC"), Mark A. Schear, M.D., and various
other Defendants for violations of his constitutional rights under 42 U.S.C. § 1983 ("Section 1983").
HHC and Dr. Schear have moved to dismiss Plaintiff's claims against them. Because Plaintiff pleads
that Dr. Schear failed to comply with certain procedural and substantive requirements of New
York's Mental Hygiene Law, Dr. Schear's motion to dismiss the due process claims against him is
DENIED. Because Plaintiff fails to plead a medical condition that was met with deliberate
indifference and fails to plead that he timely served a notice of claim on HHC, Defendants' motion
to dismiss the deliberate indifference and state law claims against them is GRANTED.

## I.    BACKGROUND[1]

### A.  Factual Background

Plaintiff is a sixty-five-year-old disabled man of Latino and Caribbean descent.  Fourth Amended Complaint (ECF No. 108) ("FAC") ¶¶ 1, 28.[2]  On or about September 10, 2015, at approximately 9:30 am, two individuals—Alicia Robinson and Wilfredo Velez—came to Plaintiff's apartment in the Bronx.  FAC ¶¶ 3-4.  Robinson and Velez asked to inspect Plaintiff's apartment for housing code violations, and Plaintiff invited them inside.  *Id.*  After Plaintiff instructed Robinson and Velez to "leave and never come back," they left Plaintiff's apartment.  *Id.* ¶ 4.

Plaintiff alleges on information and belief that Robinson and Velez called the police.  *Id.* ¶ 5.  According to Plaintiff, "[n]othing that they told the police would have justified the police coming to Plaintiff's apartment," Plaintiff "had not engaged in any behavior to justify the police coming to the apartment," and, therefore, anything that Robinson and Velez told the police "would have been false."  *Id.*  The police arrived approximately fifteen minutes later, and twelve unidentified officers (John Doe Police Officers Nos. 1 through 12) "began banging on Plaintiff's door demanding to talk to" him.  *Id.* ¶ 6.  The officers also "demanded that Plaintiff stand directly behind" the closed front door, which Plaintiff refused to do.  *Id.*

Plaintiff refused to open the door for the police and "never consented" to the police's entry into his home.  *Id.* ¶ 10.  Plaintiff asserts that he "never threatened anyone," "never committed any

---

[1] Unless otherwise noted, the facts are taken from the fourth amended complaint or Plaintiff's opposition to Defendant's motion to dismiss, and are accepted as true for the purposes of this motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2]  The fourth amended complaint is composed of a form complaint and several additional typewritten pages.  The allegations set forth in the typewritten pages are organized in numbered paragraphs.  The allegations set forth in the form complaint are not organized in numbered paragraphs.  The Court therefore cites to page numbers when citing to the allegations in the form complaint and to paragraph numbers when citing to the additional typewritten pages.  The page numbers cited to are those indicated on the ECF docket notation, not the page numbers included as footers on the form complaint.

visible crime while inside his apartment," and "never caused any disturbance of any kind inside his apartment." *Id.* After approximately one hour, the police officers broke the door down, and one of the officers placed Plaintiff in handcuffs and "pushed" him out the door. *Id.* ¶ 12. Plaintiff had "an injured foot" and had difficulty navigating the stairs leading down from his apartment. *Id.*

Police officers escorted Plaintiff to an ambulance outside, and two emergency medical technicians ("EMTs") transported Plaintiff to North Central Bronx Hospital. *Id.* ¶ 14. A uniformed police officer accompanied them to the hospital, and, at the hospital, "police were everywhere." *Id.*

Upon Plaintiff's arrival at the North Central Bronx Hospital, hospital staff asked Plaintiff for his name, address, and date of birth. *Id.* ¶ 17. Plaintiff provided the requested information, and his responses were recorded on a computer. *Id.* The staff asked Plaintiff nothing about his medical condition, whether he was injured, whether he had any allergies, or the reason for his presentment at the hospital. *Id.* Hospital staff instructed Plaintiff to remove any personal property from his pockets and person and logged those items on a written form. *Id.* While at the hospital, Plaintiff "never engaged in any threatening or dangerous behavior directed at himself or others, was well-groomed, appeared physically healthy, and appropriately clothed." *Id.* ¶ 16. He was "favoring his right foot" as a result of "the injury on the staircase in the apartment building." *Id.*

Plaintiff was then taken to the psychiatric unit located on the thirteenth floor. *Id.* ¶¶ 16-17. There, Plaintiff's handcuffs were removed, but he was told that he was not free to leave. *Id.* ¶ 16. Plaintiff observed that the hospital contained "many armed uniformed police officers," *Id.* ¶ 17, and the doors had "code systems." *Id.* ¶ 18. "[T]his was not a regular hospital." *Id.* ¶ 17.

Plaintiff was instructed to sit in a waiting area while his room was being prepared. *Id.* An unidentified doctor, John Doe Doctor No. 1, then ordered Plaintiff "forcibly hospitalized" without performing "an independent assessment." *Id.* "Not long" after Plaintiff arrived at the hospital, Dr. Mark A. Schear ordered Plaintiff to be medicated without "an independent evaluation." *Id.* ¶ 21.

Despite Plaintiff's objections, he was held down by John Doe Officers Nos. 1-12, John Doe Nurse No. 1, and other hospital staff and was given an injection of Risperdal by a nurse. *Id.* Plaintiff was "afraid to try and leave." *Id.* ¶ 19.

Plaintiff remained in the hospital from September 10, 2015 to September 16, 2015. *Id.* ¶ 20. During his commitment, Plaintiff was forced to take Risperdal pills prescribed by Dr. Schear. *Id.* ¶ 21. John Doe Orderly No. 1 regularly told Plaintiff he had to take the pills, and John Doe Nurse No. 5 warned Plaintiff that if he did not take the pills, the nurse would report that to her supervisor, who would then send nurses to "physically force [Plaintiff] to take the pills." *Id.* ¶¶ 21, 23. Plaintiff was also subjected to mandatory blood draws. *Id.* ¶ 27. Plaintiff made numerous requests to the nursing station to be released from the hospital, but he was told that only the in-house psychologist or Dr. Schear could authorize his release. *Id.* ¶ 22. On September 16, 2015, Plaintiff was released into the care of his sisters. *Id.* ¶ 24.

### B. Procedural Background

Plaintiff initiated this action on December 15, 2016. ECF No. 2. Plaintiff was granted leave to proceed *in forma pauperis* on January 17, 2017. ECF No. 3.

On January 26, 2017, the Court *sua sponte* dismissed Plaintiff's claims against the Civil Court of the City of New York, Bronx County, the Health and Hospitals Corporation, its unidentified employees, Dr. Schear, Ari Benedict, Sergio Anagunbla, the New York City Police Department ("NYPD"), the 50th Precinct, and the "NYCEMS." ECF No. 5. The Court granted Plaintiff leave to replead his claims against the Health and Hospitals Corporation, its unidentified employees, and against Dr. Schear, Ari Benedict, and Sergio Anagunbla. *Id.*

On March 15, 2017, Plaintiff filed a first amended complaint. ECF No. 17. On April 6, 2017, after obtaining leave of court, Plaintiff filed a second amended complaint. ECF No. 27. On July 19, 2017, the Court granted Plaintiff leave to file a third amended complaint for the purpose of

naming individuals defendants that the City of New York had identified pursuant to the Court's *Valentin* order. ECF No. 65. Plaintiff filed his third amended complaint on July 28, 2017. ECF No. 66.

On September 8, 2017, Defendants New York City Health and Hospitals Corporation ("HHC") and Dr. Schear moved to dismiss Plaintiff's third amended complaint. ECF No. 77. On October 5, 2017, Plaintiff filed an opposition to that motion. ECF No. 83. On October 19, 2017, Defendants filed a reply. ECF No. 88.

On February 23, 2018, the Court granted Plaintiff leave to file a fourth amended complaint for the purpose of correctly identifying certain Defendants. ECF No. 107. The Court explained in its order that, because Plaintiff represented that he would make no substantive change to the allegations, the Court would construe the motion to dismiss the third amended complaint as a motion to dismiss the fourth amended complaint. *Id.* On February 27, 2018, Plaintiff filed a fourth amended complaint, amending only the newly identified Defendants' names. ECF No. 108. Accordingly, the Court evaluates Defendants HHC and Dr. Schear's motion to dismiss as a motion to dismiss the fourth amended complaint.

## II.     STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual

allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678-79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

Because Plaintiff is proceeding *pro se*, the Court must liberally construe Plaintiff's allegations and "interpret[ ] [them] to raise the strongest arguments that they *suggest*."[3] *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation

---

[3] Defendants argue that because Plaintiff allegedly received assistance from a licensed attorney, the Court should not apply the liberal *pro se* standard and should not consider facts or legal theories raised for the first time in Plaintiff's opposition. Defs.' Reply (ECF No. 88) at 3. At the May 2017 initial pretrial conference, Plaintiff acknowledged that he had received assistance from this district's *pro se* clinic. Plaintiff's submissions to the Court, however, do not indicate who, if anyone, aided Plaintiff in their preparation. The Court observes that Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss appears to have been drafted with the assistance of an attorney. Accordingly, the Court will not afford Plaintiff's memorandum of law the special solicitude usually afforded to *pro se* litigants. *See Spira v. J.P. Morgan Chase & Co.*, 466 F. App'x 20, 22 n.1 (2d Cir. 2012) (summary order). However, there is no clear indication that Plaintiff's fourth amended complaint was prepared by an attorney. That complaint consists of both a form *pro se* complaint and several appended type-written pages. The complaint alleges various facts, but is entirely devoid of any specifically identified causes of action, which the Court would expect to see had the complaint been prepared by an undisclosed attorney. Therefore, the Court will continue to afford Plaintiff special solicitude in construing the allegations of the fourth amended complaint. *See Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

omitted); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ." (internal quotation marks and citation omitted)); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was filed *pro se*, it must be construed liberally to raise the strongest claims it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013))). Nevertheless, "dismissal of a *pro se* complaint is [ ] appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

## III. DISCUSSION

### A. Federal Claims

Plaintiff's fourth amended complaint can be construed as raising claims against Defendants for violations of Plaintiff's constitutional rights under Section 1983. To state a claim under Section 1983, a plaintiff must allege that the defendant "acted under the color of state of law and that [he] deprived him of a right secured by the Constitution or laws of the United States." *Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004) (citing *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). "Section 1983 does not in and of itself create any substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right." *Watts v. N.Y. City Police Dep't*, 100 F. Supp. 3d 314, 322 (S.D.N.Y. 2015) (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617-18 (1979)).

The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*,

262 F.3d 146, 155 (2d Cir. 2001) (citation omitted).  Additionally, to hold a defendant liable under

Section 1983, "a plaintiff must demonstrate some affirmative link to casually connect the action with

the discriminatory action."  *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004)

(quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)).

### 1.  Under Color of State Law

An individual acts under color of state law when he or she exercises power "possessed by

virtue of state law and made possible only because the wrongdoer is clothed with the authority of

state law."  *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (citation omitted).  Therefore, a

violation of a federal constitutional or statutory right is actionable under Section 1983 when that

violation is the result of "the exercise of some right or privilege created by the State . . . or by a

person for whom the State is responsible."  *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982).

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or

while exercising his responsibilities pursuant to state law."  *West v. Atkins*, 487 U.S. 42, 50 (1988); *see

also Lugar*, 457 U.S. at 937.

HHC is a "public benefit corporation created to provide health and medical services to New

York City residents pursuant to New York City Health and Hospitals Corporation Act."  *Simpkins v.

Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993) (citing N.Y. Unconsol. Laws § 7382); *see also

Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).  As a municipal corporation,

HHC and its employees are state actors for purposes of Section 1983.  *See Rookard v. Health and

Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983); N.Y. Pub. Auth. Law § 1261 (16) (defining "state

agency" to include any "public benefit corporation . . . of the state").  Plaintiff's allegations suggest

that the relevant actions of the Individual Defendants were taken while those Defendants were

acting in their roles as employees of HHC.  Accordingly, Plaintiff has satisfied the first element of

his Section 1983 claims.

### 2. Constitutional Violations

Defendants have moved to dismiss only Plaintiff's claims for due process violations, deliberate indifference to his medical needs, and *Monell* liability. Plaintiff asserts in his opposition that his complaint can also be read to raise a Fourth Amendment claim. Defendants do not move to dismiss that claim. Therefore, to the extent that Plaintiff's fourth amended complaint can be read to assert a Fourth Amendment claim, or any other federal claim, those claims survive.

#### a. Claims Against Dr. Schear

##### i. Procedural Due Process

To succeed on a procedural due process claim, a plaintiff must establish that (1) he possessed a liberty interest, and (2) defendants deprived him of that interest through insufficient process. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). "Civil commitment for any purpose requires due process protection," *Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983), and "erroneous commitments, of course, implicate the individual's interest in liberty," *Goetz v. Crosson*, 967 F.2d 29, 33 (2d Cir. 1992). On the other hand, the Second Circuit has found that compliance with the New York's Mental Hygiene Law ("MHL") satisfies both the procedural and substantive due process rights of involuntary committed individuals. *See Project Release*, 722 F.2d at 971; *Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995) ("New York's overall statutory scheme governing involuntary commitments has been held facially sufficient to meet the requirements of due process."). Therefore, "if defendants' actions comported with the strictures of the New York Mental Hygiene Law, they also satisfied the requirements of procedural due process." *Capellupo v. Nassau Health Care Corp.*, No. 06-cv-4922 (JFB) (ETB), 2009 WL 1705749, at *7 (E.D.N.Y. June 16, 2009); *accord Coleman v. State Sup. Ct.*, 697 F. Supp. 2d 493, 504 (S.D.N.Y. 2010).

Article 9 of New York's Mental Hygiene Law ("MHL") governs the involuntary commitment of individuals. Based on Plaintiff's allegations, it can reasonably be inferred that he

was admitted to the hospital on an emergency basis.  While various provisions of the MHL discuss involuntary commitment on an emergency basis, Plaintiff's arguments in opposition to dismissal rely on MHL § 9.39.  *See* Pl.'s Opposition to Mot. to Dismiss (ECF No. 83) ("Pl.'s Opp.") at 7.[4]  That section, titled Emergency Admissions for Immediate Observation, Care, and Treatment, provides in relevant part that

> [t]he director of any hospital maintaining adequate staff and facilities for observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.

N.Y. Mental Hygiene Law § 9.39(a).  Under the MHL, "likelihood to result in serious harm" means "[(1)] substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or [(2)] a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm."  *Id.*

MHL § 9.39 further provides that the hospital director "shall admit such person . . . only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section."  *Id.*  A person admitted pursuant to § 9.39 "shall not be retained for a period of more than forty-eight hours unless within such period such finding is

---

[4] Other sections of the MHL also allow for the involuntary commitment of a person.  For example, MHL § 9.27 provides that a hospital "may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person."  MHL § 9.41 permits police to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."  MHL § 9.58 allows members of a mobile crisis team to "remove . . . or direct the removal of any person to a hospital . . . for the purpose of evaluation for admission if such person appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."  Plaintiff alleges that a mobile crisis team came to his home and that the police were called by that team.  He does not allege that any family member or other person filed an application for his admission.  Therefore, MHL §§ 9.41 and 9.58 may apply to Plaintiff's claims against the crisis team and the police officers.  However, from Plaintiff's allegations, it appears that Plaintiff correctly identifies § 9.39 as the statute applicable to the claims against HHC as the receiving hospital.

confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital." *Id.*; *see also Rueda v. Charmaine D.*, 906 N.Y.S.2d 246, 251 (1st Dep't 2010) (acknowledging that the MHL requires "a hospital staff psychiatrist" to confirm the admitting doctor's initial diagnosis); *Liu v. N.Y. State Dep't of Health*, No. 16-cv-4046 (ER), 2017 WL 3393944, at *8 (S.D.N.Y. Aug. 7, 2017) (noting that if a person is retained for more than forty-eight hours another psychiatric staff member must examine and confirm that the patient should be admitted pursuant to § 9.39).

Plaintiff alleges that John Doe Doctor No. 1 admitted him without an initial examination, which, as just explained, is required under MHL § 9.39(a). Plaintiff also alleges that he was kept at the hospital for more than forty-eight hours without the required second examination by a member of the psychiatric staff. According to the fourth amended complaint, Dr. Schear was one of two hospital physicians responsible for authorizing Plaintiff's release. In light of these allegations, Plaintiff sufficiently pleads a procedural due process violation by Dr. Schear. Though Dr. Schear may not have been responsible for the failure to screen Plaintiff upon admission, he is alleged to have been responsible for Plaintiff's continued detention during the following five days. In the absence of both of the examinations mandated by the MHL, Plaintiff sufficiently alleges that Dr. Schear violated his procedural due process rights in keeping Plaintiff confined without the requisite screenings. *Cf. Liu*, 2017 WL 3393944, at *8 (dismissing due process claim where medical records attached to the complaint showed that plaintiff was examined after being transported to Bellevue Hospital, a determination was made that "she had a mental illness that would likely result in serious harm to herself or others," and Plaintiff was examined a second time less than forty-eight hours after her admission).[5]

---

[5] Defendants argue that, "[b]ecause Plaintiff did not identify the governing legal standard in his complaint, and cites conflicting legal standards in opposition to co-defendant's motion, it necessarily follows that he has not adequately pleaded that the Hospital defendants did not comply with the governing legal standard." Defs.' Reply (ECF No. 88) at

## ii. Substantive Due Process

Construing Plaintiff's complaint liberally, Plaintiff alleges that his substantive due process rights were violated when (1) he was involuntarily committed despite showing no signs of dangerousness and (2) he was forcibly medicated against his will.

"The substantive component of the Due Process Clause of the Fourteenth Amendment prohibits certain state actions 'regardless of the fairness of the procedures used to implement them.'" *Matthews v. City of New York*, No. 15-cv-2311 (ALC), 2016 WL 5793414, at *5 (S.D.N.Y. Sept. 30, 2016) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). "An involuntary civil commitment is a 'massive curtailment of liberty,' and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez*, 72 F.3d at 1061 (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)) (other citations omitted). To constitute a substantive due process violation, a defendant's conduct must be so offensive that it "shocks the conscience" and violates the "decencies of civilized conduct." *Lewis*, 523 U.S. at 846-47.

### A. Involuntary Commitment

"As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." *Rodriguez*, 72 F.3d at 1061 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975)). Nonetheless, "due process does not require a guarantee that physician's assessment of the likelihood of serious harm be correct." *Id.* at 1062. "[A] doctor will not be liable under § 1983 for treatment decisions she makes unless such decisions are 'such a

---

6. Defendants point out that, in opposing a previous motion to dismiss filed by co-Defendant New York Presbyterian Hospital, Plaintiff stated that he was not sure whether he was involuntarily committed pursuant to MHL § 9.41 or § 9.58. *Id.*; *see* ECF No. 73 at 2. Plaintiff's opposition to the motion currently before the Court argues that Defendants violated MHL § 9.39. *See* Pl.'s Opp. (ECF No. 83) at 7-8. At the pleading stage, a plaintiff is not required to plead specific statutes or legal theories. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) ("Federal pleading rules call for a short and plan statement of the claim showing that the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."). Moreover, Defendants are in much better of a position to know on what basis they admitted and kept Plaintiff involuntarily in their hospital. Accordingly, the Court declines to dismiss Plaintiff's complaint based on Plaintiff's failure to specify in the complaint the section of the MHL that he believes was violated.

substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (second alteration in original) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)); *see also P.C. v. McLaughlin*, 913 F.2d 1033, 1042-43 (2d Cir. 1990). Therefore, "a physician's decision to involuntarily commit a mentally ill person because he poses a danger to himself or others shocks the conscience . . . when the decision is based on 'substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community.'" *Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010) (quoting *Rodriguez*, 72 F.3d at 1063); *see also Lewis*, 523 U.S. at 846-47 (requiring conduct that "shocks the conscience" to sustain a substantive due process claim). The "substantial departure" standard "requires more than simple negligence on the part of the doctor but less than deliberate indifference." *Kulak*, 88 F.3d at 75 (citations omitted).

The Second Circuit has recognized that a physician's decision to commit a person involuntarily under the MHL "does not ordinarily involve matters 'within the layman's realm of knowledge.'" *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987)). Whether a decision to commit someone violates substantive due process "turns on the meaning of the fact which [typically] must be interpreted by expert psychiatrists and psychologists." *Id.* at 191 (alteration in original) (quoting *Addington v. Texas*, 441 U.S. 418, 429 (1979)). Accordingly, where a dispute exists as to whether a physician's decision to involuntarily admit a person to a hospital was a substantial departure from accepted medical practice, that dispute is often more appropriate for resolution at the summary judgment stage, not on a motion to dismiss.

Plaintiff states a due process claim with respect to his hospitalization. The fourth amended complaint is rife with allegations that Plaintiff "never threatened anyone," "never committed any visible crime while inside his apartment," and "never caused any disturbance of any kind inside his

apartment" that would have given the police reason to believe that he was a danger. FAC ¶ 10.

Plaintiff further alleges that during his stay at the hospital, he "never engaged in any threatening or

dangerous behavior directed at himself of others[,] . . . was well-groomed, appeared physically

healthy, and appropriately clothed." *Id.* ¶ 16. According to Plaintiff, "[a]t no point during the

entirety of this interaction did Plaintiff verbally or physically threaten, intimidate, or frighten another

person or himself, nor did he attempt to do any of those actions." *Id.* ¶ 15. Particularly given

Plaintiff's allegation that "[n]o hospital staff performed a medical evaluation of Plaintiff," the fourth

amended complaint sufficiently alleges that no basis existed for the conclusion that Plaintiff posed a

danger to himself or to others.

Defendants argue that Plaintiff's substantive due process claim must fail because he has not

alleged that "an evaluation was never performed during his admissions; he simply claims that an

evaluation was not performed by Dr. Scher or the admitting physician." Defs.' Mem. in Support of

Motion to Dismiss (ECF No. 78) ("Defs.' Mem.") at 12-13. Defendants misread the fourth

amended complaint. Plaintiff clearly alleges: "No hospital staff performed a medical evaluation of

Plaintiff." FAC ¶ 21.

Defendants further argue that Plaintiff's substantive due process claim must be dismissed

because the fourth amended complaint "falls well short of stating facts from which an inference of

'a substantial departure from accepted judgment, practice, or standards as to demonstrate that [he]

actually did not base the decision on such a judgment' can be made. Defs.' Mem. at 12 (alteration in

original). As the Court has explained, however, Plaintiff alleges plausibly that he demonstrated no

behavior that would have suggested that he was a danger to himself or others. Plaintiff also alleges

that an initial evaluation was not performed, that Dr. Schear conducted no independent evaluation,

and that no medical evaluation was conducted by any hospital staff. Defendants posit that Plaintiff's

"altercation" with the police, which resulted in the police breaking down his door, provided a

sufficient basis for a finding of dangerousness. *Id.* However, the fourth amended complaint suggests that Plaintiff did not engage in an altercation with the police, but simply did not acquiesce to the police's request to stand directly behind the door of his apartment. *See* FAC ¶ 6. Plaintiff's assertions that he exhibited no behavior that could be deemed dangerous are not controverted by anything further in his pleadings, for example, by medical records attached as exhibits to the fourth amended complaint. In light of the utter lack of any allegations to the contrary, it is Plaintiff's alleged commitment in the absence of any evaluation and any outward behavior suggesting Plaintiff's dangerousness that departs from accepted standards and "shocks the conscience." *Lewis*, 523 U.S. at 846-47.[6]

Because Dr. Schear is alleged to have been responsible for Plaintiff's discharge, yet kept Plaintiff confined for six days despite the alleged lack of any showing of dangerousness, Plaintiff states a claim for a substantive due process violation against Dr. Schear. *See Capellupo*, 2009 WL 1705749, at *7 ("[T]hough no overt act is expressly required, there must be some showing of danger in order to invoke the procedures of Section 9.39." (citing *Rodriguez*, 72 F.3d at 1062-63)); *see also Matthews*, 2016 WL 5793414, at *6 n.3 (denying motion to dismiss where plaintiff alleged that hospital staff mischaracterized facts in their reports, falsified documents, "reached medical conclusions without seeing, meeting, or speaking with [p]laintiff," and sought to commit plaintiff for reasons unrelated to her medical condition). Defendants will have the opportunity following discovery to demonstrate that Dr. Schear's actions did not substantially depart from accepted standards of medical care.

---

[6] Defendants assert that Plaintiff's allegations regarding his lack of threatening behavior are conclusory and should be disregarded. Defs.' Reply (ECF No. 88) at 3-4. Those allegations are made in the negative. That is, Plaintiff alleges that he did *not* conduct himself in a threatening or dangerous way. Defendants provide no basis on which the Court should hold Plaintiff, particularly in light of his *pro se* status, to a standard that would require him to list specifically everything that he did *not* do.

## B. Forced Medication

Psychiatric patients have a "'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Sell v. United States*, 539 U.S. 166, 178 (2003) (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)). Forcing such drugs on a patient is unconstitutional "absent a finding of overriding justification and a determination of medical appropriateness" by a medical professional. *Riggins v. Nevada*, 504 U.S. 127, 135 (1992); *see Harper*, 494 U.S. at 231.

New York law has established that an adult has the right to refuse medical treatment except "in narrow circumstances, including those where the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." *Jelich v. Hogan*, No. 09-cv-3278 (BMC), 2009 WL 3497495, at *3 (E.D.N.Y. Oct. 27, 2009) (quoting *Kulak*, 88 F.3d at 74); *see Kulak*, 88 F.3d at 74 ("It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." (citation omitted)). This right and its exception are codified in the New York Code of Rules and Regulations ("NYCRR"), which provide in relevant part that

> (c) Patients who object to any proposed medical treatment or procedure . . . may not be treated over their objection except as follows:
>
> (1) Emergency treatment. Facilities may give treatment, except electroconvulsive therapy, to any inpatient, regardless of admission status or objection, *where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness*. Such treatment may continue only as long as necessary to prevent dangerous behavior.

14 N.Y.C.R.R. § 527.8(c)(1) (emphasis added). The NYCRR defines "dangerous" to mean "that a patient engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm to himself or others." *Id.* § 527.8(a)(4).

Plaintiff alleges that upon his admission, "no medical questions were asked of [him], [he] was not asked if he was injured, [and he] was not asked if he was allergic to anything." FAC ¶ 17. Further, he claims Dr. Schear "did not perform an independent evaluation," yet an orderly "would regularly tell plaintiff that he had to take pills prescribed by Dr. Schear." *Id.* ¶¶ 21, 23. The fourth amended complaint also alleges that, following Dr. Schear's orders, unidentified police officers and hospital staff forcibly injected Plaintiff with Risperdal despite Plaintiff's objections. *See id.* ¶ 21.

As the Court has explained, Plaintiff sufficiently alleges that there was no basis on which to conclude that he was dangerous. Therefore, Plaintiff's allegations suggest that he was a competent person, and that no "overriding justification" or finding of medical necessity existed that would permit Plaintiff's medication over his objections. *Riggins*, 504 U.S. at 135. While Plaintiff fails to plead any facts that suggest that Dr. Schear knew of Plaintiff's objections to the medication or was otherwise involved personally in the administration of the medication itself, Plaintiff alleges that Dr. Schear prescribed the injection and the pills without first conducting an evaluation of Plaintiff and without the benefit of Plaintiff's medical history.[7] The New York Court of Appeals has noted the potential "devastating" side effects of antipsychotic drugs, which include "an irreversible neurological disorder." *Rivers v. Katz*, 67 N.Y.2d 485, 490 n.1 (1986). The prescription of potentially dangerous antipsychotic medication without first conducting a medical evaluation of the patient may be a "substantial departure" from generally accepted standards of medical care. *Kulak*, 88 F.3d at 75; *see, e.g.*, *Cameron v. Zucker*, No. 17-cv-3420 (JGK), 2017 WL 2462692, at *5 (S.D.N.Y. June 7, 2017) (describing charges against a physician for his failure to perform physical examinations and his prescription of medication "without appropriate medical indications" as "allegations of professional

---

[7] Defendants argue that there is no allegation that Plaintiff actually took the pills or was actually forced to take them. See Defs.' Mem. at 12. The fourth amended complaint, however, alleges that "Plaintiff was not given the option to refuse to take the medication, *and he was forced to take it.*" FAC ¶ 23 (emphasis added). The Court is satisfied that Plaintiff pleads that he was forced to take the pills, and it can reasonably be inferred from this allegation that he did, in fact, take the pills against his will.

misconduct"); *Gross v. N.Y. State Dep't of Health*, 716 N.Y.S.2d 780, 828 (3d Dep't 2000) (affirming finding of professional medical misconduct where physician prescribed narcotic pain relievers "without ever having examined the patient"). Medical experts are required, however, to establish the applicable medical standards and whether Dr. Schear's actions amounted to a substantial departure from those standards. *See Olivier*, 398 F.3d at 190. At this stage, Plaintiff's allegations are sufficient.

### 3. Deliberate Indifference to Plaintiff's Medical Needs

Defendants move to dismiss any claim for deliberate indifference to Plaintiff's medical needs that his fourth amended complaint may be read to raise. Any such claim is dismissed.

To establish a claim for deliberate indifference to serious medical needs, a plaintiff must make a "threshold showing" of a "serious illness or injury." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (explaining that, under the Fourteenth Amendment, a deliberate indifference claim lies if defendants denied the plaintiff "treatment needed to remedy a serious medical condition and did so because of [their] deliberate indifference to that need" (alteration in original) (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996))).

Here, Plaintiff fails to allege any injury or illness for which hospital staff failed to provide adequate medical care. While he alleges that his foot was injured when the police escorted him from his home to the ambulance, he does not allege that the hospital staff failed to treat his foot injury. Rather, any deliberate indifference claim against the hospital staff, including Dr. Schear, appears to be premised on the administration of medication against Plaintiff's will and in the absence of any medical evaluation. The prescription of medication for an underlying condition without any medical exam may be grounds for a deliberate indifference claim. *See, e.g., Abraham v. DiGuglielmo*, No. 06-cv-0058, 2010 WL 2136600, at *1, 9 (E.D. Pa. May 25, 2010) (finding that plaintiff's allegations that he suffered from pain and swelling of a testicle but that the treating physician prescribed antibiotics

"without examining plaintiff or administering tests to confirm the diagnoses" were sufficient to state a claim for deliberate indifference); *cf. Koehl v. Bernstein*, No. 10-cv-3808 (SHS) (GWG), 2011 WL 2436817, at *23 (S.D.N.Y. June 17, 2011) (citing to *Abraham v. DiGuglelmo* and finding that plaintiff failed to state deliberate indifference claim when his pleadings did not suggest that he "was not examined, treated, or administered medically-indicated tests for his lung disease—situations that case law has found to constitute deliberate indifference"), *report and recommendation adopted*, No. 10-cv-3808 (SHS), 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011). However, in the absence of the threshold pleading of an injury or condition that required treatment, the Court cannot find that Plaintiff has stated a deliberate indifference claim.[8]

### b. Claims Against HHC

To the extent that the fourth amended complaint can be construed to raise a claim against HHC for municipal liability under *Monell*, that claim is also dismissed.

As the Court has explained, HHC is a "public benefit corporation created to provide health

---

[8] It is unclear to what extent the deliberate indifference standard applicable to pretrial detainees applies to claims brought by involuntarily committed plaintiffs. In *Youngberg v. Romero*, the Supreme Court held that it was error to apply the Eighth Amendment deliberate indifference standard to involuntarily committed patients. 457 U.S. 307, 325 (1982). The Court explained that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22. At the same time, the Court recognized that physicians are better suited than the courts to determine the appropriate course of medical treatment of a patient. *See id.* at 322-23. In light of these considerations, as well as the states' interests in being able to provide care to the involuntarily committed without an overburdening threat of liability, the Court held the appropriate standard applicable to the claims of involuntarily committed patients to be the following: the decision made by a professional "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. The Second Circuit has explained that this standard "requires more than simple negligence on the part of the doctor *but less than deliberate indifference.*" *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (emphasis added) (citations omitted). The Second Circuit has not indicated, however, whether an involuntarily committed plaintiff may bring a deliberate indifference claim, under the standard applicable to pretrial detainees, separate and apart from a claim under *Youngberg*'s substantial departure standard. At least two other courts in this district have recognized this unanswered question. *See Muhammad v. New York City*, No. 15-cv-5603 (LTS) (JCF), 2016 WL 4367970, at *4 (S.D.N.Y. Aug. 12, 2016) (noting that "the case law is somewhat unclear as to what standard should apply to the Fourteenth Amendment claim" brought by an involuntarily committed individual); *Dubose v. Boudreaux*, No. 12-cv-7633 (KBF), 2014 U.S. Dist. LEXIS 123777, at *14-16 (S.D.N.Y. Aug. 20, 2014) (discussing the two standards and speculating that the "substantial departure" standard of *Youngberg* would apply to plaintiff's forcible medication claim but the deliberate indifference standard would apply to a claim of inadequate dental and medical care). The Court need not answer this question, however, because to the extent that the deliberate indifference framework is applicable, Plaintiff fails to allege an underlying medical condition or injury that was met with deliberate indifference.

and medical services to New York City residents pursuant to New York City Health and Hospitals

Corporation Act." *Simpkins*, 832 F. Supp. at 73 (citing N.Y. Unconsol. Laws § 7382); *see also Rookard*

*v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983). As a municipal corporation, HHC cannot

be held liable under Section 1983 pursuant to a theory of *respondeat superior. See Rookard*, 710 F.2d at

45; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *Pembaur v. City of Cincinnati*, 475

U.S. 469, 478 (1986) ("[A] municipality cannot be made liable [under Section 1983] by application of

the doctrine of *respondeat superior.*"). Rather, "liability under [Section] 1983 is governed by principles

set forth in *Monell.*" *Simpkins*, 832 F. Supp. at 73 (citing *Rookard*, 710 F.2d at 44-45). To establish a

claim under *Monell*, a plaintiff must "demonstrate that, through its deliberate conduct, the

municipality was a moving force behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37

(2d Cir. 2008) (internal quotation marks and citation omitted). Therefore, to state a claim against a

municipal corporation, "a plaintiff is required to plead and prove three elements: (1) an official

policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."

*Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alterations

omitted); *see Monell*, 436 U.S. at 690-91.

A plaintiff may satisfy the "policy or custom" prong in one of four ways: by proving the

existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by

final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at

483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and

implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to

properly train or supervise municipal employees that amounts to deliberate indifference to the rights

of those with whom municipal employees will come into contact, *City of Canton v. Harris*, 489 U.S.

378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996). A single

occurrence does not give rise to liability unless caused by an official policy or the decision of a final

policymaker.  *Roe*, 542 F.3d at 37; *see also Pembaur*, 475 U.S. at 480.

Here, Plaintiff does not allege the existence of any formal HHC policy or persistent practices.  In fact, he alleges no facts regarding any conduct by the hospital in connection with any other patient.  His allegations address only his own brief stay at the hospital.  Further, while Plaintiff alleges that nearly all of the hospital staff with whom he interacted violated his due process rights in one form or another, he does not allege any facts that would suggest he blames the hospital's failure to properly train or supervise its employees.

Nor does Plaintiff allege facts suggesting that any of the actions taken against him were by a final policymaker.  Where the contention is not that the defendants' actions were taken pursuant to a formal policy, but rather that they were taken or caused by an official whose decisions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved.  *See Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge . . . .").  It is not enough that the official has been granted discretion in the performance of his duties.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.").  "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."  *Id.* at 123 (quoting *Pembaur*, 475 U.S. at 483).

Whether the official in question had final policymaking authority is a legal question, which is

to be answered on the basis of state law.  *McMillian v. Monroe County,* 520 U.S. 781, 786 (1997) (explaining a proper "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"); *accord Jett,* 491 U.S. at 737; *Praprotnik,* 485 U.S. at 123-24.  "[T]he relevant legal materials[] includ[e] state and local positive law, as well as custom or usage having the force of law."  *Jett,* 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1) (internal quotation marks omitted).  The determination of whether the official is a final policymaker under state law is "to be resolved by the trial judge before the case is submitted to the jury."  *Id.*

The fourth amended complaint contains no facts that suggest that any of the nurses responsible for administering the medication had any decision-making authority.  To the contrary, Plaintiff's allegations suggest that the nurses were acting pursuant to Dr. Schear's orders.  The allegations that John Doe Doctor No. 1 and Dr. Schear had the authority to involuntarily commit Plaintiff and to discharge him, respectively, also do not suffice to suggest that either of those physicians is a final policymaker.  Plaintiff's allegations fail to suggest that John Doe Doctor No. 1 or Dr. Schear had any authority beyond the discretionary authority that is normally afforded physicians in their treatment of patients.  Nothing in the fourth amended complaint suggests that either doctor had the authority to establish hospital policy or to determine what procedures were to be used in admitting, treating, and discharging involuntarily committed patients.  Accordingly, Plaintiff fails to state a *Monell* claim based on a single act of a final policymaker.  *See, e.g., Powell v. Corr. Med. Care, Inc.,* No. 13-cv-6842, 2014 WL 4229980, at *6 (S.D.N.Y. Aug. 15, 2014) (dismissing *Monell* claim where plaintiff alleged "no facts suggesting any individual [physician] defendant was acting as a policymaker"); *Dilworth v. Goldberg,* 914 F. Supp. 2d 433, 454 (S.D.N.Y. 2012) (dismissing *Monell* claim because plaintiff alleged no facts indicating that "any of the persons employed by [New York Medical College ("NYMC")] who committed allegedly unconstitutional acts are final

policymakers of NYMC"); *Smiley by Smiley v. Westby*, No. 87-cv-6047 (LAP), 1994 WL 519973, at *10

(S.D.N.Y. Sept. 22, 1994) (rejecting argument that physician was final policymaker because he was

"vested with discretion to determine the course of treatment for patients he sees"); *but see Estiverne v.*

*Esernio-Jenssen*, 833 F. Supp. 2d 356, 370-71 (E.D.N.Y. 2011) (finding triable issue of fact as to

whether defendant was final policymaker when evidence showed that hospital staff "referred to and

deferred to [the defendant] in determining a course of action" and that the Administration for

Children Services "always followed" the defendant's recommendations and made decision to

remove a child "in unison" with the defendant).

In sum, in the absence of allegations of a policy or custom or constitutional violations by a

final policymaker, Plaintiff's *Monell* claim must be dismissed.

### B. State Law Claims

Defendants move to dismiss any state law claims suggested by the fourth amended

complaint on the ground that Plaintiff failed to comply with New York's notice of claim

requirements.

Section 7401 of the New York Unconsolidated Laws provides in relevant part that

> an action against the corporation for damages for injuries to real or
> personal property, . . . or for personal injuries, alleged to have been
> sustained, shall not be commenced more than one year and ninety days
> after the cause of action thereof shall have accrued, *nor unless a notice of*
> *intention to commence such action* and of the time when and the place where
> the tort occurred and the injuries or damage, were sustained, together
> with a verified statement showing in detail the property alleged to have
> been damaged or destroyed and the value thereof, or the personal
> injuries alleged to have been sustained and by whom, *shall have been filed*
> *with a director or officer of the corporation within ninety days after such cause of*
> *action shall have accrued.*

N.Y. Unconsol. Law § 7401(2) (emphasis added).  This "notice of intention to commence [an]

action," or "notice of claim," is a condition precedent to bringing actions against HHC.  *Scantlebury v.*

*N.Y.C. Health & Hosps. Corp.*, 4 N.Y.3d 606, 609 (2005); *see Jean-Laurent v. Wilkerson*, 461 F. App'x

18, 24 n.3 (2d Cir. 2012) ("A notice of claim is a condition precedent to the filing of an action against an employee of the City of New York."); *accord Hardy*, 164 F.3d at 793. The notice-of-claim requirement does not apply to federal claims brought under Section 1983. *See, e.g. Bordeau v. Metro. Transit Auth.*, No. 06-cv-6781 (DLI), 2008 WL 4455590, at *1 (E.D.N.Y. Sept. 30, 2008). However, "in a federal court, state notice-of-claim statutes apply to *state*-law claims." *Hardy*, 164 F.3d at 793 (emphasis in original) (citation omitted); *see also Cruz v. City of New York*, 232 F. Supp. 3d 438, 448 (S.D.N.Y. 2017). "The notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Cruz*, 232 F. Supp. 3d at 438 (quoting *Fincher v. City of Westchester*, 979 F. Supp. 989, 1002 (S.D.N.Y. 1997)).

Compliance with the notice of claim requirement is strictly construed. *Hardy*, 164 F.3d at 793-74. In fact, the New York Court of Appeals has held that service of a notice of claim on the wrong public entity merits dismissal of a plaintiff's tort claim. *Scantlebury*, 4 N.Y.3d at 614. To ensure that the notice-of-claim requirement is followed, "New York's law requires a plaintiff to plead in the complaint that: (1) the plaintiff has served the notice of claim; (2) at least thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy*, 164 F.3d at 793.

Defendants argue that any state law claims against them are barred because Plaintiff does not allege that he served a notice of claim on HHC. Defendants acknowledge Plaintiff's allegation that he filed a timely notice of claim with co-defendant New York City by filing a notice with the Comptroller's Office. *See* FAC ¶ 29. Defendants contend, however, that service of a notice of claim on the Comptroller's Office is insufficient to serve HHC because HHC is a separate and distinct entity from the City for purposes of notices of claim. Defendants are correct.

New York courts "have long recognized that the City of New York and HHC are separate entities for the purposes of a notice of claim." *Scantlebury*, 4 N.Y.3d at 611; *see Bender v. New York City*

*Health & Hosps. Corp.*, 38 N.Y.2d 662, 665-66 (1976). The provisions of New York's General

Municipal Law § 50-e apply to the notice-of-claim requirement with respect to claims brought

against NYCHHC. *See Scantlebury*, 4 N.Y.3d at 610; N.Y. Unconsolidated Laws § 7401(2) ("All the

provisions of section fifty-e of the general municipal law shall apply to such notice [of intention].").

General Municipal Law § 50-e(3) explains that proper service of a notice of claim requires delivery

of "a copy thereof personally, or by registered or certified mail, to the person designated by law as

one to whom a summons in an action in the supreme court issued against such corporation may be

delivered, or to an attorney regularly engaged in representing such public corporation." N.Y. Gen.

Mun. Law § 50-e(3)(a). The New York Court of Appeals has made clear that service of a notice of

claim on the City Comptroller's Office is not effective service on HHC. *See Scantlebury*, 4 N.Y.3d at

613 (citing *Stallworth v. N.Y.C. Health & Hosps. Corp.*, 663 N.Y.S.2d 287 (2d Dep't 1997)). Therefore,

because Plaintiff alleges only that he served a notice of claim on the Comptroller's Office, he has not

satisfied the requirement of pleading timely service on HHC. His state law claims are dismissed.[9]

## IV. CONCLUSION

For the reasons sated above, HHC and Dr. Schear's motion to dismiss is GRANTED in

part and DENIED in part.

Plaintiff states a claim for a Fourteenth Amendment procedural due process violation against

Dr. Schear.

Plaintiff states a claim for a Fourteenth Amendment substantive due process violation

against Dr. Schear.

Plaintiff's deliberate indifference claim against Dr. Schear is dismissed without prejudice.

---

[9] Defendants also move to dismiss Plaintiff's state law claims because "he does not specify any basis for those claims." Defs.' Mem. at 14. Defendants fail to elaborate on that argument, however. Although the Court has dismissed Plaintiff's state law claims on other grounds, Defendants and their counsel are reminded that Plaintiff's complaint is subject to the liberal construction standard applicable to *pro se* litigants. Defendants, on the other hand, have the benefit of counsel. The Court expects that, going forward, Defendants and their counsel will provide the Court with fully developed arguments, providing both the factual and legal predicates that they believe support their arguments.

Plaintiff's *Monell* claim against HHC is dismissed without prejudice.

Plaintiff's state law claims are dismissed without prejudice.

Plaintiff is granted leave to replead those claims that have been dismissed without prejudice. In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). The Court will schedule a deadline for submission of a fifth amended complaint after the Court has decided the outstanding motion to dismiss.

The Court requests that counsel for Defendants provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is directed to terminate the motion pending at ECF No. 77 and to mail a copy of this order to Plaintiff by certified mail and by regular, first class mail.

SO ORDERED.

Dated: July 17, 2018
New York, New York

_____
GREGORY N. WOODS
United States District Judge